Paul Turner, Federal Public Defender Office, Las Vegas, NV I'm here this morning to represent Kendrick Collier. I'd like to, unless the court would like me to go in a different order, I'd like to address the issues raised in our brief seriatim. The first issue deals with ineffective assistance of counsel for putting on testimony that their client was convicted of a felony, carrying a concealed weapon, when in reality he was convicted of a gross misdemeanor which would not have been admissible under Nevada law. This was a catastrophic mistake in a case, a murder case involving guns, where the key issue in the case was whether the client, the defendant, possessed a gun, indeed whether there was a third gun at all involved. As the court knows, there were three people in a U-Haul truck, and the issue before the jury was to determine who, if anyone, shot and killed the individual and also wounded the other party, and whether or not there were two shooters or three shooters was crucial to this case, and whether or not Mr. Collier had contact with a gun was the key issue in the case. And his own lawyer put before the jury that only a few months earlier, in March of 1996, pardon me, a few months before this matter occurred, which was in September of 1996, that he had been convicted of carrying a concealed weapon. He had also, by the time of trial, been revoked off that conviction. He had gotten probation, had been revoked off of it, and had gotten a nine-month sentence. The lawyers dropped the ball in a number of ways here, and I'd like to quote from the record on a couple of things that I think are crucially important here. My first quote is at excerpts of record page 1189 and 1190, which are in volume six of this record. This is the trial judge before Mr. Collier ever testified. This is what he told Mr. Collier. And I'll start in line 20 on page 1189, where he told Mr. Collier, additionally, sir, if you do take the stand and testify, the district attorney could inquire of your criminal records, stemming back ten years, as to felonies. They couldn't go into it greatly, but certainly could make it known to the jury. And then he asked Mr. Collier, do you understand that? I said, yes, I do, Mr. Collier says. Then he goes on. This is most crucial. The only other thing I would say is this, sir, your attorneys are experienced. This question of whether or not you testify is a rather important one, no question about that. And I would listen to my attorney's advice, whatever it is. That's the advice from the court to Mr. Collier. All right. My next quote would be an excerpt from record page 1697, which is at volume seven of the record. This is what the lawyer told or said she indicated to Mr. Collier. This is in the middle of the page, line nine. Ms. Duffy. And she was asked by the judge, why didn't your client not correct you in your belief that he had spent two years in prison on a weapons charge? Ms. Duffy. Well, I think that one of the things, Your Honor, is that defendants often assume that their attorneys know more about certain things than they do. No assumption here, Your Honors. The trial judge told the defendant that his lawyer knew more than he did. This goes on. And I think when I talk to him about it, I know that, and this is critical, I mean I didn't come in and ask him. I came in and talked about how we were going to deal with that in his testimony. The lawyer came in, the lawyer told Mr. Collier exactly what was going to happen. We're going to ask you if you've been convicted of a felony. Obviously you're going to answer yes, and that's what's going to happen. What's happened in this case was the lawyers had the courage and the fortitude to come forward and admit their mistake. They didn't do it years later. They did it shortly thereafter at sentencing when they saw the pre-sentence report, and I'm sure that was a rather bad day for them when they realized what they had done. They came in and told the court and said, we made a mistake, Your Honor. Our client deserves a new trial. From that moment on, both the trial judge and the Nevada Supreme Court decided that the one to blame for this was not the lawyers, but the defendant. This is a case where his own lawyers didn't understand what he was convicted of, and somehow he's supposed to know more about it than they do. And one additional point which is graphic here, I think, is that this same office that these folks worked in, although it had changed names and had been funded slightly differently, this exact same office represented Mr. Collier in his carrying a concealed weapon charge. They had actually represented him and handled his case when he was revoked off probation. That office had an institutional memory of exactly what that he was convicted of a gross misdemeanor, not a felony. But instead of walking down the hall and getting the file, instead of really checking it, doing the right thing, they decided to make a judgment call off a scope. Anyone who's ever practiced criminal law, I think I can fairly say this, has looked at a scope, knows that they require some close review to figure out your client's criminal history. But you do it carefully, and the justice is put on this kind of evidence, unless you were entirely sure you were correct. These folks were wrong. This man deserves a new trial because of this error. But we're reviewing on habeas here, and the Nevada Supreme Court's had a decision. What's our standard review, and how do we look at this, and how do we review the prejudice standard of Strickland? I think, Your Honor, obviously hits the case. The case, obviously, is Strickland. As we all know, I think. I mean, that's a good argument. I mean, you have a beautiful argument, but we still have to deal with Strickland, and we're up here on habeas. No, you do, Your Honor. And I think, as was mentioned recently by the United States Supreme Court in the Quarterman case, I didn't 28J it. I probably should have. I think that case makes it clear and confirms what I think most courts had already done, that when you apply Strickland, you don't have to have exact facts to apply Strickland under the ADPA. The fact that the facts are different, I don't know of an exact case on this. There may be one buried somewhere, but I'm not, I didn't find an exact case. But I think it's a very reasonable application of Strickland that, one, a lawyer shouldn't do what these lawyers did, and that a court shouldn't hold the defendant to some duty to cure his lawyer's error. That is not in Strickland. I don't find any duty to cure in Strickland. Obviously, a defendant has to be honest and straightforward with his attorneys. But this is not a case, there's no evidence in this record that Mr. Collier was dishonest or in any way devious at all. He did just what the judge told him to do. Well, that may be true. Collier had a history, he'd had a history in the system, and I think he's probably aware of what he'd been convicted of. I mean, I don't know if this was ever, I don't know where it is in the record, but he didn't come in here on a clean slate. He had a record. He was the one that was convicted of these things. And I don't know whether the Nevada Supreme Court went off on the fact that he had lied to the police about his knowledge of the shooting and other evidence of guilt to get around the Strickland issue. And I don't know how we're supposed to look at it. I think, obviously, the fact that he lied, I don't think anybody should lie to police, but the fact that a 19-year-old, or I think he just turned 20 about a month earlier, running away from what was obviously going to be a situation that was not going to be pleasant, whether you're innocent or guilty, the last thing anyone wants to do is to be caught up in something like this. The fact that he lied to the police, I don't see that that changes anything in the argument I'm making, with all due respect. It certainly doesn't suggest that he lied to his lawyers or that he did anything dealing with them. He made a mistake. He did use poor judgment, no doubt about that. And I may have missed the other point Your Honor was making. The Nevada Supreme Court said there was other evidence of his guilt. I think what they were going is to the prejudice, probably. How do we address that? I think the best, well, I cite the Jeffries case, the Inbach opinion of this court in page 1490 of the Jeffries case, 114 F. 3rd at 1490. This court has said, Juror knowledge of defendant's past criminal record has long been recognized to be prejudicial. And this is the most important language. The possible prejudice is even more likely when the past record is related to the crimes for which the defendant is on trial. That's exactly you couldn't, short of a murder case involving three people with two guns, or whatever, you and this concealed weapon case that was the mistaken felony, if you want, quote, unquote, and the shooting. I mean, they're almost gloved together. And here you've got jurors sitting there and they're saying, well, gee, six months earlier, this gentleman was convicted of carrying concealed weapon. Wow. I wonder if he could have been doing that today. I mean, the power of that is overwhelming. The fact that the jury stayed out actually a fairly long time is sort of amazing, in a way, when you think about what that kind of evidence would be. I think the prejudice is graphic here. I think the prejudice from knowing in a similar situation with similar crimes, from knowing that the defendant had previously been convicted recently, I think it just dominates the landscape in this case. As this Court has said How similar are they? Because of the sufficiency of evidence argument, we wound up getting pretty deep into the evidence back and forth. And it didn't strike me as all that similar. So I've been sitting there trying to figure out, because I think the issue for ineffective assistance of counsel has to be the prejudice prong. And it's not an accident. That's all that anybody seems to have talked about recently, because it's, it's, but how prejudicial is this, this past episode, the conviction? Is that going to tilt the balance with regard to what he's supposed to have done in this episode? Your Honor, I think it does, because I think that what the defense was saying to the jury was, Mr. Collier was, was, was there. No one was denouncing him. No question he's there, but he didn't have a gun. They were, they were saying he didn't have a gun. He didn't shoot a gun. Nobody, the, the, the surviving victim who's, who's running away says he never saw Mr. Collier with a gun. And he never saw Mr. Collier do anything except start to step out of the truck. So any, anything that, that places a gun in the hand of Mr. Collier, at any point, is kind of important. And here, this, this prior conviction places a gun in his hand only six months earlier, in March of 96 versus September of 96. So the jury knows, wow, during the same year, this young man had a gun. I, I think that's powerful testimony. And, and, and unfortunately, I think it probably carried the day in this very close case. Obviously, we're saying the evidence was insufficient. And, and we, we, I want to, I'd like to address that issue, of course. But at worst, you'd have to say this is a extremely close case for a conviction. When you, when no one can say that they saw Kendrick Collier holding a gun in his hand. Now, realize, we'll get to Ms. Murillo in a moment, and I think she, although her testimony is a little equivocal and so on, I think she says that she saw them with guns. Your Honor, correct. She, she obviously, and of course, the district court points out the obvious, that she wouldn't have known who any of the people were. But she did say there were three people. That was, of course, 18 months after she gave a written statement within, within minutes, if not an hour, I think about an hour of the, of the event. She gave a written, handwritten statement. And the language at the bottom says, this is true and accurate. It isn't a sworn statement. I think the district judge, I believe, said that. But boy, that's close to a sworn statement. This is true and accurate. And it's her writing. And she says something that says there are two people. And then 18 months later, amazingly walks in and says, wow, there are three people. That, that's, that's an incredible change on her part. In a short period of time. But I want to talk about sufficiency for a moment, but then I'll move back to your prejudice argument. But, but there is evidence in the record, testimony at trial, she says, I saw three men with three guns firing about two rounds each. Now, you can impeach it by saying you had an earlier statement and so on, but she states that on the stand. She does, Your Honor. Now, how many guns were located? Just two. And I recollect, was either one of them the silver revolver that was seen in the hand? So we have testimony that two are found. None of them quite matches the description of the gun in the hand of the people, the guy we know is the shooter, right? That's correct, Your Honor. So, so now going back to the prejudice problem and ineffective assistance to counsel, you're, you're saying that the evidence was equivocal enough as to who had guns, how many people had guns, how many guns there were and so on, that this satisfies the prejudice standard, more probable than not would have made a difference to the outcome when we know that he was convicted of a, of a firearm offense within a year. Yeah, yeah. That's the argument. That's correct. In carrying a concealed weapon, not, not, you know, yeah, it's possession of a weapon within a year. I would like to, I'm sorry, I don't want to interrupt you. I wanted to clarify one point we were talking about. On the third gun, the revolver, which was not found, I'm looking for the name. I think his name is Barrientos, the man that was shot. Barrientos is running away. I'm sorry, Your Honor. Figueroa is actually the gentleman running away. Barrientos was the driver and the shooter. Figueroa is running away. He was shot in the foot. He said he looked back and saw the, the revolver being shot by, the revolver in the hand of, I think, the driver. That's correct, Your Honor. He identified that. So the only way you can get the guns in, if you will, or the sufficiency of the evidence, is through the victim who got shot, one of them, who said, I saw the revolver, and through Morello, Ms. Morello, who said she saw the three. So there is evidence of three guns. There's evidence of two, of the two automatic pistols in the sense that the shell casings were found. And it was only the fact that you have to go to the testimony relative to the, the pistol being, the observation of the person that was shot. But there is evidence in the record that the jury saw of all three guns. That's correct, Your Honor. One thing about the pistols, which is, it's interesting, when they, when they stopped the vehicle, and there were two people there and there were two pistols, and it, you know, you wonder, well, if there was a third, why wasn't it there? I mean, I mean, you know, why, why, why would a third be thrown away if the two are still there? I mean, it made no sense. So why is it an interesting question for the jury? But the testimony is that the revolver, which was specifically, the other two are automatics. The revolver is different because it doesn't eject shells as you shoot it, the shell casings. And somebody identified it the first time we shot that it was a, as I remember, a silver revolver. Not that it was a gun or a pistol. He specifically identified it. Unless I misread the records. You're absolutely correct, Your Honor. Interestingly about that, though, that the, the district judge, and this really is irrelevant, I suppose, but he, he, he tends to question Mr. Figueroa's testimony about Mr. Collier doing nothing, basically, and saying, and Mr. Figueroa said he was doing nothing. He just got, he started, he was out on the edge side of the truck. He wasn't doing anything. And he did not have a gun. He didn't see anything. If Mr. Figueroa was trying to get away, he was being shot. No, I agree. But then suddenly the district judge flips that and says, what we do, he was accurate about the silver gun. I mean, it's hard to be, you know, it's a strange thing. He's either accurate one way or the other. But I think, I think there's a real question. The lady, interestingly, says on cross-examination that she could not tell the difference between a revolver and an automatic. I mean, she, she, she acknowledges that there's no way she could tell the difference. She, and she never said it was a silver gun. But, but she did say there was three. So you have this, this mixed mess. You do. You do, Your Honor. I'd like to, if I might return briefly to one thing. You had, you had mentioned Mr. Collier's record. As I know Your Honor is well aware, his record, except for the concealed weapon, which is the one we're talking about today, so much, his record was all a juvenile record. And I, I, I, I, I would just reference the fact, I don't know how it fits in very frankly, but it, it wasn't as he was a novice to the system. He'd been before the system. He'd been convicted of things. So in his mind, I don't know what he knew or what he thought he knew, but it wasn't as though someone threw a felony out at him. He says, what are you talking about? I mean, he'd been in the system. But the juvenile system is very different, Your Honor. And I know Your Honor is well aware of that. Sure. Juvenile system and the terminology and all of that, not, I, I'm no expert on Nevada juvenile law, but I know from my past work and other states that, that juvenile terminology is very, very different. And I, I, I, I wasn't going anywhere other than the fact that he wasn't a novice to the, to the criminal justice system. No, he, he was a novice, but he was also. He'd been convicted of, even if it was juvenile, he'd been convicted. So he knows what it means to get in trouble with the law, at least that. He had a pre-sentence report. When you look at it, it shows felony zero and one mis, and one misdemeanor. You made your point. That's a good point. Let me ask you one question before we hear from the other side and save a little time for a rebuttal. The Nevada Supreme Court, how do you read its order? Did it find no ineffective assistance of counsel because the, the, the, the counsel had performed up to standard or because it was, it failed to meet the prejudice prompts? I think it was saying it was, we failed to prove prejudice. I think it blamed the defendant. In essence said, almost like a contributory negligence type of analysis, the way I was reading it. It, in essence, found the defendant had failed on his own to, to correct it and therefore there was no prejudice. I think that's a bizarre ruling, really strange. Your Honor, I, I would like to have a few moments at the end, but could I touch briefly on the, on the confrontation issue or, or would, just, just to indicate that, that we've obviously alleged and asserted that when Ms. Morello's written statement was not admitted that that was a denial of the right to confrontation. I understand that she was cross-examined orally, if you will, about her, her inconsistencies. But here, as I said before, is a written statement signed and it says true and correct. And it's filled out by her and it's, it's contemporaneous. That may be the most important part. It's within an hour or so of the actual event and it's signed by the lady. And it could have gone to the jury in Nevada. It would have gone into the jury room with them. And we're, our argument is that that's dramatically different qualitatively from, from a simple cross-examination orally. That's something the jurors would have had. Would you give up cross-examination for a piece of paper? Well, if those are the... I mean, I mean, we're talking here that you had a chance to cross-examine her on anything you wanted to in the paper, but you'd give up the cross-examination punch for a piece of paper in there. Well, I, I wouldn't... Well, he doesn't give you that. In other words, I think, I think, I, I, all I'm saying is I think you got everything in that was on the paper. You're asking us to go a little bit further. Yeah. I, I think with the jury, because there's a timeframe between the testimony and when the case actually gets into the jury room. And I think having that piece of paper with the jury, I think it might be real, real important, Your Honor, but that's... It might be real important. I'm questioning the law and... Well, I think, I think under Nevada law, that, that was an absolute right. And it, under Nevada law, that was substantive law. I mean, that was a substantive piece of evidence that should have gone into the case. And I think that fits in, in the, in the sufficiency analysis also. Okay. There's more I would like to say about sufficiency, but I think I'd better sit down. If I could have just a moment... We'll make sure you get some time for rebuttal, but as I think you can tell, we have, we're fairly familiar with the record. Good morning. I'm Eric Levin. It's my pleasure to be representing respondents in this matter. With respect to the first issue on ineffective assistance of counsel, I think as was mentioned, the question is whether or not under AEDPA, the decision of the Nevada Supreme Court represented an unreasonable... What do you think the Nevada Supreme Court ruled on that? What do I think they ruled on? Yeah. Yeah. What do you think? I think... I have a little trouble parsing exactly what they said and trying to figure out what, what the basis was. I mean, I don't, it didn't seem to me like they were saying, no, this was reasonable performance by an attorney, but there's a suggestion of that. I don't know where this, this, it's the fault of the defendant himself element fits into the equation. So... Well, I think under Strickland, the, the, the defendant's actions, they, they are one of the factors that we consider in determining, uh, counsel, the reasonableness of counsel's investigation or failure to investigate. And, and Strickland talks about that. So based on what, on the defendant's actions, um, we apply a, a, under Strickland, a, not a, a, not deference, but a heavy measure of deference to counsel's decision not to further investigate a particular issue. So in this case, if the defendant failed to, uh, uh, correct a misperception that he had been convicted of a felony, that is, is something that can be considered in terms of whether or not counsel performed, um, a reasonable... Are we starting from the point of view that counsel has in its hands something that it thinks may be a felony? And so there's no maliciousness. We're going to, I know this is, this is not, this is a misdemeanor, but we're going to use it as a felony. There's nothing malicious about what counsel did. They just have this document. So whether they should have gone further to say, what does this document mean? Or what do I think it means? You're saying they could go to the defendant and say, I don't know if this happened. Uh, this is your record, correct? And you're saying that's the way it proceeded? That's not exactly what counsel was arguing. No, no. I'm saying that, uh, defendants do, uh, counsel was arguing that, uh, uh, counsel here today was arguing that trial counsel should have, uh, performed additional investigation to determine the nature of, of this prior conviction. Well, I don't think he said that. He just said flat out it wasn't one, and the record showed that it wasn't one. I guess it would be more investigation. There's nothing in here that said it was a deliberate thing. Um, that's correct. So how does the defendant fit in that, in that, in that circumstance if, in fact, counsel should have gone a little bit further? What, what, what is the defendant supposed to do? Say... Well, um, we're, we're not assuming that counsel should have gone any further. Whether or not counsel should have gone further, well, it was somewhat dependent on the representations made by their client. And I think that's where the, uh, the defendant's actions come into play in the Strickland analysis. The guy with, with 15 prior says to his counsel, I've never been convicted. So counsel goes to trial on that? Counsel has a client assigned to him. Mm-hmm. Client says, I've never been convicted before. So counsel can just rest and say, oh, good, I got a guy that's very clean. I don't have to check his record out. Don't have to look in the files. No problem. He just said he's clean. I think in the absence of any, any kind of indication otherwise, uh, I don't know that that would violate the Strickland standard. Whoa. Really? I think so. That was tough. Maybe you're better off just switching around and say, look, if you got a guy that says, I have been convicted, that you're likely I think we're, we're going to trust. I mean, it's not, it's, it's the rare defendant that exaggerates his record. This happens to be the rare defendant. But, but, yeah. I sit here and I'm trying to figure out, okay, the, the Nevada Supreme Court's decision's entitled to a deference under EPTA, but what exactly am I deferring to? Because I'm sitting here trying to figure out, okay, did they set, because there's a sentence here. Appellant failed to demonstrate this year, rendered the jury's verdict unreliable. And that seems to say no prejudice. It doesn't say there wasn't an error. It says there's an error. It's not unreliable. But the discussion is, well, like the defendant should have caught the mistake. And that seems to flow back to the first part, that, well, maybe it wasn't so unprofessional because who's to know that you've got to go check your, your client's records. And if, if this sentence does mean, look, there's no prejudice here, what's the basis for saying there's no prejudice? Because at least in this part of the discussion, although there's a lot of discussion elsewhere, and maybe it can be inferred from elsewhere, this paragraph doesn't talk about there was overwhelming evidence. I mean, we constantly see things saying it wouldn't have mattered, the evidence was overwhelming. We've got to defer to that. But it doesn't make any reference to other evidence. So that's why the question that Judge Fletcher posed earlier was exactly the one that I had. I'm not entirely sure what the Nevada Supreme Court ruled, and so I don't know what I'm obligated to defer to. What's your take on this? Well, my take was that the State court had actually ruled on, on both prongs, and that the District, Federal District Court declined to address the first prong, just ruling on the second prong of Strickland. The reason I think that you can find that there was no violation under AEDPA that, with respect to the Nevada Supreme Court's decision, on the, on the first prong, for the reasons I stated, you know, the council had a sheet. It indicated that there was a revoked probation, the defendant would be given two years incarceration, and that he must register. On top of that, you've got two attorneys looking at this, not just one, reaching the same conclusion, and then the defendant's mischaracterization of his own record. So certainly, a court might have looked at that differently, but under those facts, I don't think we can say. When you say two attorneys, you're talking about the prosecutor as one of those two attorneys. I don't, I don't think we can say necessarily that the Nevada Supreme Court's decision was unreasonable in light of those facts, even though another review in court might have come out differently. On the second prong, on the prejudice prong, I think the Nevada Supreme Court did talk about credibility of the defendant, and they talked about the, the, the other evidence that had been presented with respect to guilt and credibility, and that, as a result of all that, and we'll get to the Jackson part, but with respect to that, they felt that Collier had not met his burden, and it is his burden to show prejudice in this case. So you do really infer from the other issues that were discussed by the court, kind of an incorporation in this one paragraph that seems to expressly discuss this issue by the factual determination that the other evidence was more than sufficient to overwhelm this particular problem. Sure. So, so, so this really reaches the issue that we talked about with your colleague in terms of how important was the prior conviction. And there's enormous overlap between the sufficiency issue and this issue.  And the standards are, of course, different. But at some point I'd appreciate it if you could give us some guidance or give us your take on why you think the prior conviction didn't make a difference here, or using this standard. There wasn't a reasonable probability of it making a difference here. Well, well, I don't think it made a difference. It's not my burden to prove that it didn't make a difference. It's their burden to prove that it did. And I don't think they've done that by anything more than speculation. We can't presume prejudice under Strickland, at least not under under these kind of facts. On top of that, I think the fact of this, this, whether he says he got on the stand and he said he had been convicted of a felony, nobody argued on either side that this was any kind of propensity evidence. That didn't occur at any time during this trial. So I don't think there was any prejudice that way with respect to credibility. As the state courts found, I believe it was the state courts, he had already, his credibility had already been impeached. And then in light of the other evidence that was presented, I don't think it's reasonable to think that the outcome probably would have been different or that there was a reasonable probability that the outcome would have been different based on this this one fact, which I don't just don't see it as being as significant as my colleague does. Well, he makes a pretty good case in the sense that it's a little different. I mean, it's not it's not novel and it's not insignificant that, you know, your client is asked to admit to committing a felony, i.e. possession of this weapon, when in fact weapons are the key issue in this case, in a sense, who shot who and how many guns were there in this in this crime. It's interesting to note that in the Supreme Court of Nevada, when they discussed this issue, the ineffectiveness of assistance of counsel regarding the gross misdemeanor, that again, counsel made this point that they talk about how the district court took care of this issue at the trial level and the fact that the appellant had lied to the police about his knowledge of the shootings and other evidence of guilt, evidence of guilt, again, tending toward prejudice. Then they talk further. Appellant's counsel asked the question and said it was defendant who in fact verified this. So in a way, it's right what counsel says is that defense counsel says that what the Supreme Court did, it relied upon the defendant not correcting counsel. But then when it ended up with this conclusion, it looked like it went to prejudice and the sufficiency of the evidence. I don't know. I don't know that you can get away from that. I mean, I'm not too sure. It's not clear to me. Well, well, so that so then we're back to that issue. Maybe you ought to address it. What is the question about the sufficiency of the evidence? Because it's going to cut both sides. It's going to cut into the ineffective assistance of counsel and the issue itself. With respect to the sufficiency of the evidence and under Jackson, we've got the surviving victim who testified, and he and Mr. Collier, they knew one another. There's testimony from both of them with regard to that. And he saw Mr. Collier get out of the vehicle from which shots were being fired and stand on the floorboards. I don't think he knew one way or the other whether or not Mr. Collier had a gun. But again, this is a guy who's being shot at and is running away for his life. So the fact that he wasn't observing every detail of what was going on behind him, I don't think is surprising. He did see another person fire what he described as a chrome revolver, a weapon that would stand out compared to what's the semi-automatic handguns. And who testified to that? I'm sorry? Who testified to that? Mr. Figueroa. He's the surviving victim, the one that was shot in the foot. And he's the one that's the friend of Collier. I don't, they knew one another. I don't know that they were friends. Yes, they both knew one another. Two semi-automatic guns, not chrome revolvers, were found. So that leaves a missing gun. Mr. Collier denied any knowledge of the shooting, the van, or the incident, which he later recanted. So that turned out to be false. His fingerprints were also found on the vehicle. Then Vanessa Murillo testified that she saw three people, one on the side of the U-Haul, which would be consistent with Mr. Figueroa's testimony, and two standing there, and that they all had guns and were firing them. And then all three left together. Mr. Collier also testified that a month before the killings, the victims had denied him and his friends' entrance into a private party. He admitted that he and a friend had rented the U-Haul that day, and that he was one of the three people present, but he claims he didn't have a gun. So Mr. Collier's argument with respect to sufficiency of the evidence wants to, the way I read it, take Jackson and flip it on its head. They want to take the evidence and look at it in the light most favorable to them. They want to resolve conflicts in their favor. For me, I have to say that I've gone through the evidence, and I'm particularly, once I read the evidence of, I think it's, I forget her name now, it's the woman who saw, I just had her name in there, saw him with three guns testify, Camillo? Camillo? Murillo. Murillo, is it? Yeah. Assuming everything that came in is properly, and I think the Jackson claim is a loser, particularly once you filter it through AEDPA, what troubles me is the ineffective assistance counsel issue. That is to say, if the case is that close, and I think it is a close case, that you can even make a Jackson argument with a straight face. And I think you can make a Jackson argument with a straight face, even though I think it's a loser, to introduce evidence that this guy has not very long ago been convicted for carrying a concealed weapon, which, in other words, this man carries weapons that are hidden. And the issue is whether or not he had and fired a weapon, oh, that's, that one's tough for me to get around a feeling, you know, that probably made a difference. I mean, if I were his, if I'm the defense lawyer, and I had a chance of keeping that out, what I wouldn't do to keep that out. I don't see this as a close case, particularly under Jackson. On the Jackson. But what about on the ineffective assistance of counsel on prejudice? On the prejudice, it's not a case of whether or not, in this case, no part of this case has to do with the concealment of a weapon and the fact that, you know, lots of people touch weapons. And not lots of people carry concealed weapons, so maybe Nevada's different, but I don't think so. Well, probably from my understanding, more in Nevada than in California. But again, I don't think there's anything that's been presented more than, you know, false presumptions or speculation that there was prejudice in this case. I think, which was more, in my estimation, more than sufficient under Jackson that this act just wouldn't have made a difference. No, that may be true, because now you flip Jackson into Strickland. There seems to be, what bothers me is there seems to be this umbrella on Strickland that gives a lot of latitude to counsel and the decisions counsel makes relative to how the trial's going to go and how he's going to proceed. What bothers me, too, I guess, is that somehow, into the hands of defense counsel, they find this record and they presume, and I'm going to go back and recheck this, they presume or misinterpret what this conviction was. And in doing so, as counsel explains, this was all set up so that the moment the defendant gets on the stand, he's asked about it and he says, well, you've been convicted of this. Yes, I got caught with the gun. Now let's go back to the first step, the Strickland test. If in fact counsel didn't know, and nobody says they did, that this was just a mistake, then we're going to go back to the prejudice. As Judge Fletcher just did, do we flop back into Jackson immediately? In other words, do we now have got the point where we're going to say we've now determined that we have to look at, was it prejudicial? If it was, too bad. The Strickland umbrella is not going to protect counsel in what he did at this point. So we flop back to Jackson immediately, is that what we do? And we look at the sufficiency of the evidence under the Jackson standard? Well, in determining prejudice, I think that's one of the things you have to do. If there's a great deal of evidence tending toward guilt, that makes it less likely that it's going to be prejudicial. But if we're going to do something with that prejudice standard, it doesn't stand alone. Can we have a different prejudice analysis on the sufficiency of the evidence and a different standard for sufficiency of the evidence under Jackson with the same evidence? See what I'm saying? That's what I think we're judging. But you have to. Strickland, reasonable probability. That's not nearly the same as saying, was there enough evidence to sustain a conviction given all the definitions? Because I think you were saying, let's jump right into Jackson. Once we get to the prejudice issue of Strickland regarding the gun and the admission of, yes, I've committed a felony. Sure. OK. So the facts that you're going to look at are going to be the same in terms of the standard of Jackson. I don't know of any case that says you apply that to the prejudice prong of Strickland. No. Strickland says reasonable probability. Right. But for counsel's unprofessional errors, the result of the proceeding would have been different. That's the standard we're applying when we're doing Strickland. Right. So looking at the facts that were presented in this case and the error that was made by counsel, and I know we've gone over it, but I don't concede that any error by counsel necessarily equates to ineffectiveness. But then applying the evidence that was before the jury, I just, I don't see how this one fact turns it over and makes it reasonably probable that the outcome would have been different. It doesn't mean probable. It means a reasonable probability. I don't think it means more probable than not. A reasonable, yeah, right. A reasonable, if I misspoke. No, no. I'm not after you for misspeaking. I'm just trying to make sure that we're focused. I think reasonable probability is a lesser showing than would be required for more probable than not. Yeah. In light that you've got three people present, three people were seen shooting. They arrived together. They leave together. Well, three people were seen shooting, maybe, that is to say we have the woman who testifies at trial that there were three, even though her not quite sworn statement before said there were only two. She testifies, well, actually, I heard the shots before I got to the window. So she actually says, I didn't actually see them shooting. The best she can say is I saw them with the guns in their hands. So maybe, I think she testified that they all had guns and were firing them. Yeah, but she also testifies that I heard the shots before I got to the window. And it was certainly within the jury's province to weigh those. If we're talking Jackson, I'm totally with you. But the issue is that testimony is soft, or that evidence is soft. Let me throw another curve at you. We're under AEDPA. So how does the AEDPA film over the top of all this help? In other words, we're looking, I think, at the second part of AEDPA, that the Supreme Court of Nevada's determination, which we've kind of talked about, was a prejudicial determination under the Strickland issue. Was it based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding? That seems to be a little bit different than Jackson. So we'd have to look not only at Strickland, but we've got this AEDPA film we've got to look through, too, on the facts that were used by the Supreme Court and their determination of prejudice. So how do you come out there? Well, I think in light of the facts, as I stated before, I think the Nevada Supreme Court certainly could have come out the way they did, and they were not unreasonable in doing it. And it's not a matter of whether or not looking at it, we might have decided differently, or this court might have decided differently. Well, standing alone, facts alone on direct appeal, this would be a flame in a forest of gas tanks. But we're now looking at it from AEDPA's different standpoint, and what the Nevada Supreme Court saw, and now what we're determining the Supreme Court is under the AEDPA standard. I think that's the way to look at this. I agree. I see I'm out of time. If I could, might I take 15 seconds? I just wanted to make sure we're on the same page. Your confrontation issue? I think we're doing fine. Thank you. I don't think you need to work. That's all right. Don't have to hurry that fast. Well, we'll give you a minute or two to say what you need to say. I appreciate that. I'd like to briefly address what the Nevada Supreme Court did or didn't do. Do you agree, though, that we're looking through the AEDPA spyglass at this point? Yes, you are, Your Honor. Because if we're on direct appeal, I think you made one heck of an argument for on a direct appeal, but now we've got to temper that with what we do on habeas and AEDPA. I understand that, Your Honor. And just to be clear, we're looking at it both as to professional conduct, prong number one, and as to prejudice, prong number two? Yes. But there are two opinions, actually, here, as the court knows. The first opinion is at EOR 1814. That was the direct appeal opinion where the issue came up in that context because it was an appeal of a motion for new trial denial. And there, it's very short. It's about the middle of that page, 1816. And I apologize. I don't remember what volume it is. But the court simply indicates that it references the erroneous classification as a felony may have had a negative impact effect on its credibility as a witness. The court totally misses the point here. Credibility is not the point here. The point here is propensity, propensity to commit crimes. And that's what this court and Jeffrey's sees very, very clearly in the en banc opinion in Jeffrey's that I alluded to before, where this court, in the same page I alluded to, quotes from an earlier Ninth Circuit case, the United States v. Bagley, quoting, the human tendency to draw a conclusion which is impermissible in law because he did it before, he must have done it again. And again, quoting from another Ninth Circuit case, United States v. Field, that, quote, he did it before, he could do it again. That's the gravamen of this. It's propensity. The Nevada Supreme Court looks at this strictly in a credibility perspective. That's why they keep, I'm sorry, Your Honor. Just a second. If we're going to go into that, and we've been there before, I don't want to read up your time. What he was convicted of was carrying a concealed weapon, not shooting one. And so there is a little bit difference. Little bit, Your Honor, but in my opinion, not too much. But the Jackson analysis, I know I've briefed it in some detail. I think the Court's aware of. There's a lot of nuances to that. I'd love to get into them, but this isn't the day for that. Thank you very much. And thank both sides for your helpful argument. The case of Collier v. McDaniel is now submitted for decision, and we're at recess for the day. We will reconvene with a slightly different configuration tomorrow morning at 9 o'clock. This court is in session. The defense is adjourned. Good evening to all of you, Mr. Segal, Your Honor. Mr. McDaniel, you're not getting a brief. It's a brief, Your Honor. Oh, God, I'm so disappointed. There's only two courts I've been to, Your Honor. I'm sorry that happened. I've listened to oral arguments. Do you have a moment? Oh, no, I never said anything. I'm just wondering if you're still here. No, I'm not. Your briefs were excellent. I was looking forward to meeting you that day, but I'm glad you filmed that. Oh, yeah. You know, I started questioning myself. Am I sick because I'm nervous about this, or am I sick because I'm sick? It turns out it wasn't about going to ring. No. Oh, you were concerned? Well, before I ran out of air for the briefs, that's when Paul got relieved from the district court and was like, oh, this is a big market. I just felt so ready when I found out about 24 hours. I was listening to oral arguments. Oh, no, you haven't said anything. It's been like a long time. I'm just one judge. Just concede it and move on. No. I know how that feels. Good to see you, Your Honor.
judges: Brunetti, Fletcher, Clifton